# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| United States of America | : | Case No. 1:08-cr-065 |
| | : | |
| | : | Chief Judge Susan J. Dlott |
| | : | |
| v. | : | ORDER GRANTING IN PART |
| | : | AND DENYING IN PART |
| Joseph Hopewell, | : | DEFENDANT'S AMENDED |
| | : | MOTION TO SUPPRESS |
| Defendant. | : | EVIDENCE AND STATEMENTS |

This matter comes before the Court on Defendant Joseph Hopewell's Amended Motion to Suppress Evidence and Statements (doc. 28) and the Government's response (doc. 33). Defendant Hopewell is charged with two counts of possession of narcotics with intent to distribute and two counts of illegal possession of a firearm. (See doc. 2.) With his motion to suppress, Defendant Hopewell seeks an order suppressing all evidence seized during a search of his residence on March 24, 2008, including but not limited to a loaded Smith & Wesson .357 Magnum bearing serial number AYW2108, powder cocaine in excess of 500 grams, and crack-cocaine in excess of five grams. Defendant also moves for the suppression of any and all statements taken from him that day.

The Court held a hearing on Defendant's motion on October 29, 2008.[1] During that hearing, the Government called six witnesses – Agent John Enderle, Sergeant Jeff Voelker, Agent Anthony Lange, Lieutenant Brad Winall, Agent James High, and Agent William Crock –

---

[1] The transcript of the suppression hearing is available at CM/ECF Doc. 40.

all of whom are assigned to the Hamilton County Sheriff's Department Regional Narcotics Unit ("RENU").[2]  The Defendant called RENU Agent Joseph Lee and John A. McCoy.  At the conclusion of the hearing, the Court ordered the Government and the Defendant to file post-hearing briefs.  Defendant filed his post-hearing brief on December 11, 2008 (doc. 51) and the Government filed its post-hearing brief on December 15, 2008 (doc. 52).

For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant Joseph Hopewell's Amended Motion to Suppress Evidence and Statements.  (Doc. 28.)  The Court suppresses all statements Hopewell made to Agent High during the interview at the Hamilton County Sheriff's Station  (hereinafter "Sheriff's Station") that took place prior to the discovery of narcotics at 889 North Hill Lane.  All other statements made by Hopewell and all evidence seized during the search of 889 North Hill Lane are admissible.

## I.    FACTUAL BACKGROUND

The events forming the basis of Hopewell's motion to suppress took place on March 24, 2008.  On that day, Agent John Enderle was conducting surveillance in his capacity as a RENU agent from an unmarked vehicle parked outside of a General Nutrition Center ("GNC") store in the Brentwood Plaza shopping center located on Winton Road in the Finneytown neighborhood of Cincinnati, Ohio.  One of the methods RENU agents use to identify drug traffickers is to conduct surveillance outside of nutrition stores such as the GNC, looking specifically for individuals who purchase inositol, a B-12 vitamin supplement that is sold in the form of a white powder and that is commonly used as a cutting agent to increase the perceived volume of

---

[2] RENU is a multi-agency drug task force in the greater Cincinnati area.  Officers assigned to RENU are responsible for investigating "upper echelon drug traffickers." (Tr. 29:9.)

cocaine.[3]  On those occasions, the agents inform the store that they are in the area and that the store should contact them if anyone purchases inositol.

On this particular day, Agent Enderle had been sitting in the Brentwood Plaza parking lot for one to two hours when, at approximately 4:02 p.m., he received a telephone call from an informant[4] who reported that a black male wearing a camouflage shirt, later identified as Algeria Fletcher, had come into the store and purchased a sixteen-ounce bottle of inositol.  The informant also indicated that a black male wearing a grey shirt, later identified as Hopewell, was with Fletcher.  Agent Enderle found the quantity of inositol purchased to be suspicious.  He testified that if used as a vitamin supplement, a sixteen-ounce bottle of inositol would typically last over a year, and that it was uncommon for someone to purchase such a large quantity.[5]

After receiving the tip, Agent Enderle saw Hopewell and Fletcher, who was carrying a white GNC bag, exit the GNC store.  Agent Enderle radioed other RENU agents about the inositol purchase as he observed Hopewell and Fletcher get into a sunburst-colored Cadillac and exit the shopping center.  Having decided to investigate further, Agent Enderle followed the Cadillac as it turned onto Winton Road, then left on Galbraith Road, and proceeded to a subdivision that was located East of Winton Road and South of Galbraith Road.  Hopewell, who

[3] Inositol is a vitamin supplement that comes in the form of pills or a white powdery substance that may be mixed with food.  When the powder form is used as recommended, an individual would only consume about one to two teaspoons per day.  Agent Enderle testified that RENU had learned from Chicago DEA that roughly eighty percent of the cocaine that Chicago DEA recovered contained inositol.

[4] Agent Enderle testified that he had previously worked with this informant, who receives compensation from RENU for the information he provides, and that the informant's past tips had been reliable and had resulted in two arrests.

[5] GNC sells bottles of inositol powder ranging in size from two-ounce bottles to sixteen-ounce bottles.

was driving the Cadillac, entered his subdivision at Congresswood, turned onto Crowden, and then turned onto North Hill Lane. Agent Enderle initially stayed behind on Crowden when he saw Hopewell park at 889 North Hill Lane. After observing Hopewell and Fletcher enter the house through a side door, Agent Enderle drove past the residence, crossed Winton Road, and positioned his car just west of Winton Road on North Hill Lane such that he could still see the residence.

In addition to Agent Enderle, who was the case agent on this particular investigation, several other agents responded to the area, including Lieutenant Winall, who supervised the investigation, Agent High, Sergeant Voelker, Agent Lee, Agent Lange, Agent Bennett, Agent Bernard Irwin, Agent Timothy Nash, Agent Stormes, and Sergeant Kevin Koo. Agent High, who was dressed in plain clothes and driving an unmarked vehicle, parked on Crowden to assist Agent Enderle with surveillance of the residence. Around the same time, Lieutenant Winall ordered Agent Crock to go to the RENU office to begin checking RENU's intelligence database for information relevant to the investigation and to start collecting information for a search warrant. Agent Crock remained at the office throughout the investigation and gathered information that the investigating officers relayed by phone or radio.

At approximately 4:18 p.m., the agents watching North Hill Lane observed a black male driving a gray Mercury Marquis with Virginia license plates pull up to the house and go inside. At 4:58 p.m., they observed another black male arrive on foot and enter the residence. The agents subsequently determined that the gray Mercury was a rental car and identified the man driving the Mercury as John McCoy and the man who arrived on foot as Bobby Pitts. Agent Enderle testified that he was not particularly concerned with the fact that the Mercury was a

rental vehicle, though he noted that based on his experience, a lot of drug traffickers like to drive rental vehicles so that if an officer were to run the license of the vehicle, the query would not show the trafficker as the owner or driver.

Two additional vehicles, a maroon Nissan and a maroon Mercury Mountaineer pulled up to the 889 North Hill Lane residence at approximately 4:59 p.m. According to Agent Enderle and Agent High, Hopewell exited the house, spoke with a male who was driving the Mountaineer, and then went back inside. The vehicles then left. Queries of the vehicles' license plates revealed drug trafficking histories, meaning either the owners or previous drivers of the vehicles had histories of drug trafficking.

At approximately 5:43 p.m., McCoy, Pitts, Hopewell, and Fletcher left together in the Mercury rental vehicle. Sergeant Voelker,[6] who was in an unmarked vehicle,[7] followed the men after he spotted them on Crowden. He observed McCoy make a left turn onto Galbraith Road without signaling and radioed the other agents about the traffic violation. He then observed McCoy switch lanes without using a turn signal and radioed word of a second traffic violation.

At the direction of Lieutenant Winall, Agent Lange, a narcotics canine handler who was driving a marked Hamilton County Sheriff's cruiser and dressed in uniform, pulled McCoy over on Galbraith Road near a Walgreens drug store. Several agents assisted with the stop including Sergeant Voelker.[8] Agent Lange approached the driver's side of the Mercury, obtained McCoy's

---

[6] Sergeant Voelker had been parked at the back entrance to a strip mall that connected to Hopewell's subdivision. From that entrance, Sergeant Voelker had a view of Crowden.

[7] Like Agent Enderle, Agent Voelker was wearing plainclothes. Agent Enderle testified that the general practice was that RENU agents driving unmarked cars also wore civilian clothing.

[8] Sergeant Voelker, Agent Lee, Agent Bennett, Agent Irwin, Agent Nash, Agent Stormes, Agent High, and Agent Enderle all responded to the traffic stop. Some of the agents assisted with

driver's license and proof of insurance, and went back to his car to run a query. The query showed no outstanding warrants for McCoy but revealed that he had a prior drug trafficking conviction. Agent Lange returned to the Mercury, obtained McCoy's consent to search the vehicle and asked the four men to step outside. Neither Agent Lange nor any of the other agents issued a traffic citation to McCoy. In fact, Agent Lange testified that RENU typically does not cite anyone for traffic violations. Rather, the intent of the agents was to speak to the occupants of the Mercury in furtherance of the narcotics investigation. After the men exited the vehicle,[9] the men were patted down for officer safety and moved to the side of the road near the sidewalk. Agent Lange obtained identification from Hopewell, Fletcher, and Pitts. In verifying their identities, Agent Lange discovered that Hopewell and Fletcher had past convictions for possession of drugs and that there was an open arrest warrant for Bobby Pitts related to a felony burglary charge. Due to the arrest warrant, Agent Lange and Sergeant Koo handcuffed Pitts, searched him, and placed him in Sergeant Koo's cruiser.

Meanwhile, Sergeant Voelker questioned Hopewell about where he had come from. Hopewell responded that he was coming from his home on Clark Street, which is in downtown Cincinnati. Sergeant Voekler did not clarify whether Hopewell meant he had just come from Clark Street or whether he had earlier that day come from Clark Street to Finneytown. Instead,

---

the stop while others observed from a distance in order to protect their undercover identities. Agent Enderle, for example, parked in the Walgreens and observed the stop, but never got out of his car and left after a few minutes. When asked why so many officers participated in the stop, Sergeant Voelker testified that the officers were conducting a drug investigation and were concerned about safety and that there had to be enough officers to interview each of the four men in the car.

[9] According to Sergeant Voelker and Agent Enderle, the men appeared to exit the car voluntarily. None of the agents drew their weapons or forcibly removed the men from the car.

Sergeant Voelker believed Hopewell was lying about having just come from 889 North Hill Lane and subsequently informed Agent Crock of Hopewell's statement.

Upon hearing that there was an open arrest warrant for Pitts and that Hopewell had stated he had come from Clark Street rather than North Hill Lane, Lieutenant Winall ordered the agents to transport all four of the men to the Sheriff's Station for further questioning. Agent Lange testified that due to safety concerns, Hopewell, McCoy, and Fletcher may have been handcuffed prior to being placed in separate police cars at the time of transport. Agent Lange, Agent Nash, and Agent Stormes subsequently searched the Mercury, but did not find any drugs. Nor did the agents find any drugs on Hopewell or any of the other men riding in the Mercury. At approximately 6:00 p.m., agents took Hopewell and the other men to the Sheriff's Station.

Some of the agents, including Agent Enderle and Sergeant Voelker, remained in Finneytown and resumed surveillance of the 889 North Hill residence. At approximately 6:00 p.m., Agent Enderle saw another vehicle, a gray Ford Explorer, pull up to 889 North Hill Lane. The driver of this vehicle parked and went inside the residence, where he stayed for over an hour. The man left the house at approximately 7:19 p.m. Sergeant Voelker followed the Explorer and observed the driver commit a traffic violation when exiting the subdivision. Shortly thereafter, Agent Nash pulled the Explorer over on Galbraith Road. At that time, Agent Nash identified the driver as Eric Brown, an individual with prior drug trafficking convictions.

Meanwhile, other agents responded to the Sheriff's Station to interview the suspects. Agent High interviewed Hopewell, who was already sitting in an interview room with Agent

Nash when Agent High arrived at the station.[10]  When Agent High entered the room, he identified himself to Hopewell and asked him if he could read and write.  Hopewell responded that he had received a high school diploma from the correctional institution where he had been incarcerated, and that he can read and write.  Hopewell asked what was going on, but Agent High put off explaining the situation, responding only that he would get to that later.  Agent High then advised Hopewell of his <u>Miranda</u> rights.  Hopewell indicated that he understood his rights, but would not sign the waiver of rights form.[11]  (<u>See</u> Gov't Ex. 4A.)  Prior to that time, none of the agents had Mirandized Hopewell.

Hopewell refused to sign the waiver of rights form, but proceeded to answer Agent High's questions.  He stated that he lived with his sister at 733 Clark Street.  When asked where he and the other men were coming from when stopped, Hopewell stated that he was coming from Lexington Avenue in Avondale.  Agent High then asked Hopewell if he knew anyone at 889 North Hill Lane.  When Hopewell responded that he did not know anyone on North Hill Lane, Agent High revealed that the agents had seen him at that residence.  After a brief pause, Hopewell then indicated that he has a female friend who was staying there and that he also stays there periodically.  Hopewell then stated that he and the other men were on their way to a hardware store when they were stopped.  According to Hopewell, the men intended to purchase a chain so that they could hang a punching bag in the back yard.  When asked about Pitts, Hopewell stated that he was a handyman and was doing some work for Hopewell – specifically, working on a fence in the back yard and building a kennel for Hopewell's dogs.

---

[10] Agent Nash did not stay to witness the interview.  Rather, he returned to the Finneytown area.

[11] The Advice of Rights form indicates that Agent High read Hopewell his rights at 6:19 p.m.

Agent High then turned to the purchase of inositol, asking Hopewell where he had been prior to arriving at 889 North Hill Lane. Hopewell stated that Fletcher had dropped him off at Petmart, which was in the same shopping center as GNC, to purchase dog food. After leaving Petmart, Hopewell stated, he walked down to the GNC to meet Fletcher. Hopewell confirmed that Fletcher had purchased inositol powder, and stated that he thought that the powder was used for weight loss.

At some point during the interview, Agent High asked Hopewell if there was anything illegal, such as drugs, inside the 889 North Hill Lane residence. Hopewell first responded that there was nothing in the house and that the agents could search it if they wanted. However, when Agent High asked Hopewell to sign a consent to search form, Hopewell refused and stated that if the agents wanted to search the residence, they would have to get a search warrant. Later in the interview, Agent High asked Hopewell again if there was anything illegal in the residence. That time, Hopewell responded that there may be a small amount of marijuana in the residence because he likes to smoke marijuana.

Throughout that evening, Agent Crock continued to document evidence as it was relayed to him by fellow RENU agents. The information he gathered included descriptions of the agents' observations, information from background checks run on Hopewell and other individuals seen at 889 North Hill Lane, and statements from the suspects. Based on this information, Agent Crock prepared an application for a warrant to search the residence at 889 North Hill Lane. (Gov't Ex. 3A.) In the affidavit offered in support of the warrant application, Agent Crock describes the items expected to be found in the residence, including drugs and drug paraphernalia, and provides a detailed account of his prior training and experience. The

remainder of the facts included in the affidavit as a basis for establishing probable cause may be summarized as follows:

- At approximately 4:00 p.m., agents received a tip from a reliable informant, who had previously provided tips leading to arrests and convictions, that a black male had purchased a sixteen-ounce bottle of inositol from a GNC on Winton Road in Cincinnati, Ohio.

- Agent Crock and his fellow agents know that inositol is often used as an adulterant for cutting cocaine.

- Agent Enderle, who was present outside of the Winton Road GNC, observed a black male exit the store carrying a GNC bag and get into a car in which another black male was in the passenger seat.

- Agent Enderle followed the two men back to 889 North Hill Lane.

- After the vehicle returned to 889 North Hill Lane, agents conducting surveillance observed a black male driving a Mercury rental vehicle arrive and enter the house.

- The surveillance agents observed two other vehicles arrive and the occupants enter the house for a short time, and then leave.

- At approximately, 5:45 p.m., surveillance agents then observed four males exit the house, get into the rental vehicle, and drive away.

- Sergeant Voelker observed traffic violations and the rental vehicle was stopped by marked RENU agents.

- After identifying the four men as Bobby Pitts, Joseph Hopewell, John McCoy, and Algeria Fletcher, the agents learned that Hopewell and Fletcher had previous convictions

for possession of drugs, McCoy had a previous conviction for drug trafficking, and Pitts had an outstanding felony warrant for burglary.

- Hopewell provided misleading information to the agents when asked where he was coming from, stating at one point that he had come from Clark Street and at another point that he had come from Lexington Avenue.

- Hopewell had $2500 in U.S. currency on his person when he was stopped.

- Agents stationed near 889 North Hill Lane observed, after the four men had left, another vehicle arrive at the house. The driver of the vehicle fit the description of Eric Brown, an individual tied to the license plate for that vehicle. Brown has one prior conviction for possession of drugs and two prior convictions for drug trafficking.

- The RENU intelligence database shows that Hopewell and McCoy are known drug traffickers. A search of the RENU intelligence database revealed that on 8/18/05, RENU received a complaint that Joseph Hopewell was selling heroin, and that in 2003, Eric Brown was selling heroin.

Agent Crock concludes the affidavit by stating that service of the warrant during the night rather than the day is warranted to prevent further distribution of drugs into the community and to protect the safety of the agents executing the search warrant by allowing them to approach the residence undetected. (Gov't Ex. 3A at 3.)

Based upon this affidavit, a Hamilton County Municipal Court Judge issued a warrant authorizing a search of the residence. (Gov't Ex. 3B.) The judge signed the warrant at 7:59 p.m. After obtaining the warrant, Agent Crock called Lieutenant Winall to inform him that the warrant was signed. After learning of the warrant, agents proceeded with the search. Therefore,

the search was already in progress by the time Agent Crock responded to 889 North Hill Lane to serve the warrant and assist in the search. Agent Crock later went to the Sheriff's Station to serve Hopewell with a copy of the warrant.

In addition to Agent Crock, Sergeant Voelker, Lieutenant Winall, Detective Roa, Agent Nash, Agent Lee, and Officer Lange, and Agent Heidemann all participated in the search. (See Def. Ex. F1.) Sergeant Voelker was one of the first officers to enter the house when executing the warrant. At approximately 8:00 p.m., he knocked on the front door because the agents had seen people inside. Through the window, Sergeant Voelker could see a woman inside the house walking from the living room to the kitchen. He showed the woman his badge and asked her to come to the door. Rather than answering the door, the woman went back into the living room and then returned to the kitchen, grabbed a plastic Kroger bag, and took it into another room. Finally at that point someone opened the door and the agents identified themselves and informed the occupants of the house that they had a search warrant. Sergeant Voelker did not actually have possession of the search warrant at that time. Rather, he had learned either by radio or by phone that the warrant had been signed. During the search, Sergeant Voelker located the Kroger bag in a closet next to the living room. The bag contained approximately 800 grams of powder cocaine. In addition to that cocaine, the agents found a small bag of marijuana, $26,683 in cash, a cocaine press, digital scales, a loaded Smith and Wesson .357 Magnum revolver, a sixteen-ounce bottle of inositol, and twenty-three grams of crack-cocaine.

The agents who executed the search informed the agents at the Sheriff's Station of the evidence that they found. Sergeant Koo then relayed this information to Agent High while Agent High was still in the interview room with Hopewell. Specifically, Sergeant Koo stated

that the agents had recovered a large amount of powder cocaine, a smaller amount of crack-cocaine, and a gun. He then stated that upon entering the residence, the agents saw a female grab a bag that was later found to contain cocaine and attempt to hide it in a closet. When Agent High told Hopewell about the drugs and gun recovered from the house and explained that the agents had seen the female attempt to hide the drugs, Hopewell stated, "The cocaine is mine." (Tr. 222:14.) Agent High then asked Hopewell, "Where did you get the cocaine from if it's yours?" At that point, Hopewell stated that he did not want to answer that question. Agent High stopped questioning Hopewell at that point. However, Hopewell subsequently made an additional statement regarding the gun found in the house. Hopewell was not asked about the gun. Rather, while doing arrest paperwork for Hopewell, Agent High asked Sergeant Koo what type of gun was recovered from the house. Before Sergeant Koo could answer, Hopewell responded that it was a Smith and Wesson .357 Magnum. Sergeant Koo then confirmed that the weapon Hopewell described was the weapon recovered during the search. Agent High testified that Hopewell never asked for an attorney during the interview and claimed that all questioning would have ceased had Hopewell asked for an attorney.

In addition to the agents, McCoy also testified at the suppression hearing and his version of the events differed somewhat from the agents' version. When asked what had occurred on March 24, 2008, McCoy stated that he had been exercising or working out with Hopewell at 889 North Hill Lane. He claimed he did not know the other two men, Fletcher and Pitts, who were present at the residence. According to McCoy, he was driving a rental car that day because he planned to go out of town the next day with his family, and he, Hopewell, and the other two men left the house together in the rental vehicle to buy equipment for a dog kennel that one of the

men was building in the backyard.  McCoy then described the traffic stop, stating that he asked the agent who pulled him over why he had been stopped and the agent said, "I can't tell you right now."  (Tr. 297:16-17.)  When asked during the suppression hearing if he remembered violating any traffic laws prior to being pulled over, McCoy responded that he did not and that he was particularly cognizant while driving because he had just taken a driving test and obtained his license.  Contrary to the agents testimony, McCoy states nothing about consenting to a search of his car.  Rather, he testified that when Agent Lange returned from running a background check on his identification, Agent Lange told him to get out of the car and then stated, "You're getting a little feisty," and handcuffed him.  (Tr. 297:20.)  Agent Lange then told Hopewell and the other two men to get out of the vehicle.  Shortly thereafter, agents transported all of the men to the Sheriff's Station, where McCoy was questioned and eventually released.

## II.    ANALYSIS

Hopewell seeks the suppression of all statements he made on March 24, 2008 and of all evidence seized during the search of 889 North Hill Lane on the bases that: (1) the traffic stop was based on a hunch; (2) the RENU agents exceeded the scope of any permissible stop by detaining Hopewell for an unreasonable period of time; (3) all statements obtained from Hopewell were taken in violation of his Miranda rights; and (4) the warrant authorizing the search of 889 North Hill Lane is defective as it is not supported by probable cause.  As described above, the affidavit submitted in request of the search warrant for 889 North Hill Lane contained statements Hopewell now seeks to suppress.  Accordingly, before this Court can determine whether the affidavit and search warrant were defective, the Court must first determine whether Hopewell's statements are admissible.

14

## A.    Hopewell's Statements

The admissibility of Hopewell's statements depends on a number of factors, including the legality of Hopewell's detention.  The Court considers first the statement Hopewell made at the scene of the traffic stop and second, the the statements Hopewell made at the Sheriff's Station.

### 1.    Statement Made at the Scene of the Traffic Stop

Hopewell was questioned briefly at the scene of the traffic stop, and made a statement about having come from Clark Street, where he claimed he lived.  In order to determine the admissibility of this statement, the Court first addresses the constitutionality of Hopewell's detention and then the alleged violation of his <u>Miranda</u> rights.  The Sixth Circuit recently set the framework for analyzing the permissibility of a traffic stop as follows:

> An ordinary traffic stop by a police officer is a "seizure" within the meaning of the Fourth Amendment.  Accordingly, any evidence seized during an illegal traffic stop must be suppressed as fruits of the poisonous tree. This circuit has developed two separate tests to determine the constitutional validity of vehicle stops: an officer must have probable cause to make a stop for a civil infraction, and reasonable suspicion of an ongoing crime to make a stop for a criminal violation.

<u>United States v. Blair</u>, 524 F.3d 740, 748 (6th Cir. 2008) (internal citations and quotation marks omitted).

The Court credits the agents' testimony in this case, particularly the testimony of Sergeant Voelker, that Agent Lange stopped the Mercury rental vehicle in which Hopewell was a passenger on the basis that Sergeant Voelker had observed two traffic violations.  Hopewell argues that the stop was an investigatory stop requiring reasonable suspicion of criminal activity rather than an ordinary traffic stop.  In doing so, he focuses on the agents' intent, arguing that the purpose of the stop was to further the narcotics investigation.  However, "when a traffic stop is

supported by probable cause, an officer's subjective intent is irrelevant." Id.  The traffic stop

was therefore justified by the observance of two traffic violations, even if the agents' hope was

to uncover more evidence of narcotics trafficking.  See id.; United States v. Mesa, 62 F.3d 159,

162 (6th Cir. 1995) (holding that "police officers [may] stop vehicles for any infraction, no

matter how slight, even if the officer's real purpose was a hope that narcotics or other contraband

would be found as a result of the stop."); United States v. Hill, 195 F.3d 258, 264 (6th Cir. 1999)

("[A]n officer may stop a vehicle for a traffic violation when his true motivation is to search for

contraband, as long as the officer had probable cause to initially stop the vehicle.").

Having determined that the initial stop was permissible, the Court next decides whether

the officers exceeded the scope of the stop by requiring that Hopewell exit the vehicle and

questioning him briefly.  In Blair, the Sixth Circuit reiterated that "[o]nce the purpose for a

traffic stop is completed, a police officer 'may not further detain the vehicle or its occupants

unless something that occurred during the traffic stop generated the necessary reasonable

suspicion to justify a further detention.'"  524 F.3d at 752 (quoting United States v. Perez, 440

F.3d 363, 370 (6th Cir. 2006) (internal quotation marks omitted)).  It is somewhat unclear when

the purpose of the traffic stop was complete in the instant case because no traffic citation was

issued.[12]  The Court need not answer that question, however, as the Court finds that the officers

---

[12] Though Agent Lange may have initially stopped the Mercury because of the traffic
violations, the nature of the stop quickly evolved beyond that of a routine traffic stop.  The Sixth
Circuit has indicated that the purpose of a traffic stop is complete at the point when the officer has
collected sufficient information to issue a citation.  Id. at 752; United States v. Torres-Ramos, 536
F.3d 542, 551 (6th Cir. 2006).  In the instant case, Agent Lange had sufficient information to issue
a citation after retrieving McCoy's identification and running a query on his driver's licence.  The
purpose of the traffic stop, therefore, was likely complete at the point when Agent Lange returned
to the Mercury after running that query.

Even so, Agent Lange was still permitted to ask McCoy for permission to search the

had reasonable suspicion to detain the men for a <u>Terry</u> stop. An officer may "stop and briefly detain a person for investigatory purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989) (quoting <u>Terry v. Ohio</u>," 329 U.S. 1, 30 (1968)). The reasonableness of the stop depends on two factors: "(1)whether there was a proper basis for the stop . . . ; and (2) whether the degree of intrusion into the suspect's personal security was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." <u>United States v. Hardnett</u>, 804 F.2d 353, 356 (6th Cir. 1986).

In determining whether Officer Lange had a particularized and objective basis for suspecting criminal activity, the Court considers the totality of the surrounding circumstances. <u>United States v. Arvizu</u>, 534 U.S. 266, 273 (2002). At the time of the <u>Terry</u> stop, the evidence before the agents included the following: roughly two hours prior to the stop, Agent Enderle received a tip from an informant of proven reliability that a man matching Fletcher's appearance had purchased a large quantity of inositol from GNC. Immediately thereafter, Agent Enderle observed Fletcher and Hopewell walking away from the GNC with a GNC bag and then followed them to 889 North Hill Lane, where agents observed a number of individuals come and go over a two hour period. One of the individuals who arrived at the house was driving a rental vehicle. Finally, license plate queries on two other vehicles that pulled up to the house and stayed for only a short period of time revealed the both vehicles were tied to individuals with a

_____

Mercury. <u>See</u> <u>Blair</u>, 524 F.3d at 752. Moreover, once Agent Lange obtained consent for the search, it was reasonable for him to require Hopewell and the others to exit the vehicle.

history of drug trafficking. Based on the totality of circumstances, the Court finds that those facts, considered together with the agents' knowledge that inositol is a known additive used to increase the volume of cocaine,[13] amount to reasonable suspicion that Hopewell and the other three men were engaged in criminal activity.

With regard to the second part of the reasonableness inquiry, the Court finds that the detention of Hopewell at the scene of the traffic stop fell within the scope of the stop. Based on either McCoy's consent to a search of the vehicle or the agents' reasonable suspicion of criminal activity, the agents were permitted to request that Hopewell and the other men exit the vehicle. It was also reasonable for Sergeant Voelker to briefly question Hopewell about his identity and about where he had been prior to the stop. These questions did not involve a significant intrusion into Hopewell's personal security. See Berkemer v. McCarty, 468 U.S. 420, 439 (1984) (noting that during a Terry stop, an "officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions"). Accordingly, the Court finds that Hopewell's rights were not violated during his detention at the scene of the traffic stop.

The Court also does not find any violation of Hopewell's Miranda rights because the agents had no duty to Mirandize Hopewell prior to questioning him at the traffic stop. Pursuant to the Fifth Amendment privilege against self-incrimination, suspects must be advised of their rights prior to a custodial interrogation. Miranda v. Arizona, 384 U.S. 436, 478-79 (1966). The fact that Hopewell may have been subject to Terry detention at the time of the questioning does

_____

[13] "In evaluating whether the totality of the circumstances supports the conclusion that reasonable suspicion exists, Courts must allow officers to draw upon their experience and training to make inferences." Arvizu, 534 U.S. at 273.

not automatically mean that he was under a custodial detention for the purposes of the Fifth

Amendment.[14]  See Berkemer, 468 U.S. at 436-41 (1984); United States v. Salvo, 133 F.3d 943,

949 (6th Cir. 1998); United States v. Knox, 839 F.2d 285, 289-291 (6th Cir. 1988).  To the

contrary, the Sixth Circuit has recognized that a suspect generally is not entitled to full custody

Miranda rights during a limited Terry stop.  Salvo, 133 F.3d at 949 ("[B]ecause of the very

cursory and limited nature of a Terry stop, a suspect is not free to leave, yet is not entitled to full

custody Miranda rights.")

In determining whether Hopewell was "in custody" at the time Sergeant Voelker

questioned him about where he was coming from, the Court considers such factors as:

> (1) the purpose of the questioning; (2) whether the place of the questioning was
> hostile or coercive; (3) the length of the questioning; and (4) other indicia of
> custody such as whether the suspect was informed at the time that the questioning
> was voluntary or that the suspect was free to leave or to request the officers to do
> so; whether the suspect possessed unrestrained freedom of movement during
> questioning; and whether the suspect initiated contact with the police or
> voluntarily admitted the officers to the residence and acquiesced to their requests
> to answer some questions.

_____

[14]     Under the Fourth Amendment, "a 'seizure' [occurs] at that point in time when, 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" United States v. Salvo, 133 F.3d 943, 949 (6th Cir. 1998) (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980)).  In contrast, with respect to the Fifth Amendment "in custody" test, "a court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Stansbury v. California, 511 U.S. 318, 322 (1994) (internal quotation marks omitted); see also Thompson v. Keohane, 516 U.S. 99, 112 (1995); Miranda, 384 U.S. at 444 (custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way"); Salvo, 133 F.3d at 949.  While a suspect's freedom to leave is something courts may consider when determining whether a person is "in custody," the two tests are not interchangeable.

Salvo, 133 F.3d at 950; see also United States v. Robinson, 217 F. App'x 503, 507-08 (6th Cir.

2007). The Court also considers "whether a reasonable person in the suspect's situation would

have believed that [he] was free to terminate the interrogation and leave." United States v.

Crossley, 224 F.3d 847, 861 (6th Cir. 2000); see also Robinson, 217 F. App'x at 507.

Weighing these factors, the Court finds that the circumstances surrounding the

questioning of Hopewell during the traffic stop would not lead a reasonable person to believe

that he was under formal arrest or restrained in his freedom of movement to the degree

associated with formal arrest. The questioning was brief and the location was not particularly

hostile or coercive. Hopewell was not handcuffed during the questioning. Nor did any of the

agents brandish a firearm or make any other show of force. Instead, the questioning was part of

a basic Terry stop and there was no requirement that Hopewell be read his rights at that time.

Having found no violation of Hopewell's rights during the traffic stop, the Court finds

that Hopewell's statement about coming from Clark Street is admissible.

### 2.        Statements Made at the Sheriff's Station

The Court turns next to the statements Hopewell made when Agent High interviewed him

at the Sheriff's Station. In determining the admissibility of these statements, the Court focuses

again on the constitutionality of Hopewell's detention. As indicated above, the agents had

reasonable suspicion to conduct a brief Terry stop of Hopewell and the other men. Hopewell

argues that the agents exceeded the scope of that stop by detaining and questioning Hopewell

over a period of several hours. The Government maintains that the prolonged detention did not

exceed the scope of the investigatory stop and that the agents had probable cause to believe that

Hopewell was engaged in criminal behavior.

The first question is whether the agents exceeded the scope of the Terry stop, transforming Hopewell's detention into a de facto arrest requiring more than reasonable suspicion. Under the Fourth Amendment, "[i]t does not take formal words of arrest or booking at a police station to complete an arrest." United States v. McCaleb, 552 F.2d 717, 720 (6th Cir. 1977). Instead, "the test for determining whether a suspect was under arrest is whether there was a . . . restraint on freedom of movement of the degree associated with a formal arrest." United States v. Richardson, 949 F.2d 851, 857 (6th Cir. 1991) (internal quotation marks omitted). Courts consider numerous factors when determining whether a Terry stop has evolved into an arrest requiring probable cause, including:

> the transportation of the detainee to another location, significant restraints on the detainee's freedom of movement involving physical confinement or other coercion preventing the detainee from leaving police custody, the use of weapons or bodily force, and the issuance of Miranda warnings.

United States v. Delano, 543 F. Supp. 2d 791, 802 (N.D. Ohio 2008) ; see also United States v. Shaw, 464 F.3d 615, 621 (6th Cir. 2006).

Applying those factors to the instant case, the Court finds that the agents exceeded the scope of the lawful Terry stop when they handcuffed Hopewell,[15] placed him in a police cruiser, and transported him to the Sheriff's Station. The fact that Agent High subsequently advised Hopewell of his Miranda rights prior to questioning him is further evidence that Hopewell's detention was transformed into a de facto arrest prior to the interview. See United States v. Smith, 549 F.3d 355, 360 (6th Cir. 2008) (noting that "under most circumstances, the police

---

[15] The testimony at the suppression hearing indicated that Hopewell was handcuffed prior to being placed in one of the agent's vehicles for transport. However, even if he had not been handcuffed, moving him to the station would have resulted in a de facto arrest under these circumstances.

cross the line between an investigatory detention and a custodial arrest, when a person is remove[d] from ... [a] place in which he is entitled to be and transport[ed] ... to the police station" (internal quotation marks omitted)); <u>Shaw</u>, 464 F.3d at 622-23 (finding that the defendant was arrested for purposes of the Fourth Amendment when a military police officer seized him on his front lawn, frisked him, handcuffed him, placed him in a police car, and transported him to the Army Criminal Investigation Division office for questioning); <u>United States v. Delano</u>, 543 F. Supp. 2d 791, 801 (N.D. Ohio 2008) (finding that the defendant was placed under <u>de facto</u> arrest following a traffic stop where the officer asked her to get out of the car, placed her in handcuffs, read her the <u>Miranda</u> warnings, and informed her that he would be taking her to the police station). Hopewell was never given the option to accompany an agent to the station voluntarily. Nor was he at any time told that he was free to leave. Lieutenant Winall, who authorized the transport, testified that Hopewell would not have been permitted to leave the scene of the traffic stop. Under the circumstances, a reasonable person would have believed that he was under arrest or was otherwise deprived of his freedom of action in a significant way. <u>See Richardson</u>, 949 F.2d at 857 (applying an objective "reasonable person" test).

To justify the <u>de facto</u> arrest of Hopewell, the Government must demonstrate that the agents had probable cause to arrest Hopewell at the time he was transferred to the Sheriff's Station. The Sixth Circuit defines the probable cause standard as follows:

> "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt." <u>United States v. Romero</u>, 452 F.3d 610, 615-16 (6th Cir. 2006) (internal quotation marks omitted) . . .. In determining whether an arrest is supported by probable cause, we look to the totality of the circumstances. <u>Id.</u> at 616. We consider only the information possessed by the arresting officer at the time of the arrest. <u>Id.</u> at 615; <u>see also</u> <u>Wolfe v. Perry</u>, 412 F.3d 707, 718-19 (6th Cir. 2005).

> A finding of probable cause does not require evidence that is completely convincing or even evidence that would be admissible at trial; all that is required is that the evidence be sufficient to lead a reasonable officer to conclude that the arrestee has committed or is committing a crime. [Shaw, 464 F.3d at 623.] A "mere suspicion of criminality," however, is insufficient to support a finding of probable cause. Williams ex rel. Allen v. Cambridge Bd. of Educ., 370 F.3d 630, 637 (6th Cir. 2004) (internal quotation marks omitted).

Harris v. Bornhorst, 513 F.3d 503, 511 (6th Cir. 2008).

The Court has already determined that based on the facts described above, such as the tip regarding the purchase of inositol and the agents' observations outside of the GNC and 889 North Hill Lane, the agents had reasonable suspicion at the time of the traffic stop. To determine whether probable cause developed prior to Hopewell's de facto arrest, the Court considers the facts giving way to reasonable suspicion in addition to any new facts that the agents learned during the traffic stop, including: (1) the identity of the four men in the car; (2) the fact Hopewell, McCoy, and Fletcher had past drug convictions, either for possession or trafficking, and that there was an open arrest warrant for Bobby Pitts related to a felony burglary charge; and (3) that Hopewell had stated that he had come from Clark Street, which is in downtown Cincinnati rather than from 889 North Hill Lane.[16] Even when considered in the aggregate, the Court cannot afford sufficient weight to these pieces of information to make a finding of probable cause.

---

[16] The affidavit submitted in support of the search warrant indicates that Hopewell had $2,500.00 on him when he was stopped. (Gov't Ex. 3A at 2.) However, none of the agents testified to finding this money on Hopewell and it is unclear when, if at all, this money was found on Hopewell. In other words, the Court does not know whether the agents found this money prior to or after transporting Hopewell to the station. Even assuming the agents found the money prior to transporting Hopewell, the Court's probable cause determination would not be altered.

The Court recognizes that the agents' discovery of Hopewell's, Fletcher's, and McCoy's past convictions for drug trafficking and possession and Hopewell's failure to be forthcoming about having just been at 889 North Hill Lane may not have dispelled the agents' suspicions. However, the new facts are not sufficiently suspicious, even when considered together with the information the agents already had, to bump that suspicion up to probable cause. Though the Court recognizes that it must consider the facts under the totality of the circumstances, the Court takes issue with one of the facts that the agents seemed to have emphasized: the purchase of inositol. It is not illegal to purchase inositol. The Government argues that Algeria Fletcher's purchase of the sixteen-ounce bottle of inositol was suspicious because of the large quantity. This piece of evidence might carry more weight had Fletcher purchased a case of sixteen-ounce bottles. However, the fact that inositol is sold in a sixteen-ounce bottle leads this Court to believe that it is not that abnormal that someone would purchase that amount of the substance. Even considering these facts together with all of the information known to the agents at the point of Hopewell's arrest, including the information pulled from the agents' knowledge of the common use of inositol as a cutting agent, the Court finds that the agents had reasonable suspicion of criminal activity, but not probable cause. Accordingly, Hopewell's arrest and subsequent detention was illegal.

The next question is whether the statements made while Hopewell was in custody, not withstanding the absence of probable cause to arrest him, were sufficiently voluntary to overcome the taint of illegality. "A confession obtained by exploitation of an illegal arrest may not be used against a criminal defendant, unless such confession results from an intervening independent act of a free will sufficient to purge the primary taint of the unlawful invasion."

<u>Shaw</u>, 464 F.3d at 626 (internal quotation marks and citations omitted) (citing <u>Brown v. Illinois</u>, 422 U.S. 590, 603 (1975) and <u>Wong Sun v. United States</u>, 371 U.S. 471, 486 (1963)). "Dissipation of the taint resulting from [illegal police action] ordinarily involves showing that there was some significant intervening time, space or event." <u>United States v. Buchanan</u>, 904 F.2d 349, 356 (6th Cir. 1990).

A threshold requirement for admissibility of Hopewell's statements is that they must have been made voluntarily for the purposes of the Fifth Amendment. <u>Shaw</u>, 464 F.3d at 626. However, even if Hopewell's statements are found to be voluntary, the statements must be suppressed unless the Court finds that they are sufficiently attenuated from the illegal arrest such that the consent is the product of an intervening act of free will. <u>See</u> <u>United State v. Lopex-Arias</u>, 344 F.3d 623, 629 (2003).

As an initial matter, the Court notes that Hopewell's statements were voluntary under the Fifth Amendment. "There is no bright-line rule for determining whether a suspect's statements were given voluntarily. Voluntariness is instead judged by the 'totality of the circumstances' in which the person made the statement." <u>United States v. Rutherford</u>, --- F.3d. ----, 2009 WL 248679, at *4 (6th Cir. Feb. 4, 2009) (citing <u>United States v. Greene</u>, 250 F.3d 471, 479 (6th Cir. 2001)). In determining voluntariness, courts must consider whether: "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." <u>United States v. Mahan</u>, 190 F.3d 416, 422 (6th Cir. 1999). Relevant factors that the Court may consider include "the defendant's age, education and intelligence; whether the defendant has been informed of [her] constitutional rights; the length

and extent of the questioning; and the use of physical punishment, such as the deprivation of food or sleep." Mahan, 190 F.3d at 423.

In the instant case there is no evidence of police coercion.  Agent High read Hopewell the Miranda warning prior to questioning him.  Hopewell indicated that he understood his rights and proceeded to answer questions, despite his refusal to sign a waiver.  There is nothing to suggest that Hopewell was withheld food or drink or that any of the agents made any affirmative misrepresentations to him in order to draw out his statements.  Nor does the Court find that the nature of the questioning was particularly coercive.  Under the circumstances, the Court does not find Agent High's activity to be objectively coercive.[17]

Having found that Hopewell's statement's were voluntary for purposes of the Fifth Amendment, the Court turns next to the issue of attenuation.  The Supreme Court has identified several factors as relevant to the issue of attenuation, including the length of time between the arrest and the statement, the presence of intervening circumstances, the 'purpose and flagrancy' of the violation, and whether Miranda warnings were given.  Brown, 422 U.S. at 603-604.

Applying those factors, the Court finds that the statements Hopewell made at the Sheriff's Station prior to the search of 889 North Hill Lane are not sufficiently attenuated from his illegal arrest.  Agent High began interviewing Hopewell shortly after he was taken into custody.  Hopewell was advised of his Miranda rights prior to being asked any questions, but there were no significant intervening circumstances between the transport of Hopewell to the station and the start of the interview.  Finally, the Court finds that the arrest of Hopewell was in flagrant disregard of his Fourth Amendment rights.  Accordingly, the statements Hopewell made

---

[17] On the same basis, the Court does not find any violation of Hopewell's Miranda rights.

during the period between his arrest and the search of 889 North Hill Lane are inadmissible. See Brown, 422 U.S. at 603-604 (holding that a statement made almost two hours after an illegal arrest, and after Miranda warnings had been given, was not sufficiently removed from the violation so as to dissipate the taint); Taylor v. Alabama, 457 U.S. 687, 691 (1982) (holding that six hour length of time between illegal arrest and confession was not a significant amount of time to break the connection between the illegal arrest and the defendant's confession where the petitioner was in police custody, without counsel, and was questioned on several occasions, even though the defendant was given three Miranda warnings).

The Court finds, however, that the few statements Hopewell made after the search of 889 North Hill Lane – specifically, Hopewell's statement that "The cocaine is mine," (Tr. 222:14), made after Agent High informed him of the drugs and gun recovered from the house, and Hopewell's description of the gun as a Smith and Wesson .357 Magnum – are admissible under Rawlings v. Kentucky, 448 U.S. 98, 108-09 (1980). In Rawlings, police arrived at a house to execute an arrest warrant for a man named Marquess. When they arrived at the house, another resident of the house and four visitors were there, including Rawlings. After smelling marijuana smoke and seeing marijuana seeds, two officers left to obtain a search warrant for the house and the remaining officers detained Rawlings and the other occupants of the house. Approximately forty-five minutes later, the officers returned with a search warrant. After reading the warrant aloud and advising the individuals of their Miranda rights, the officers ordered one of the visitors to empty her purse onto table, which she did, revealing a jar containing LSD tablets and a number of small vials containing other controlled substances. The owner of the purse turned to Rawlings and told him "to take what was his." Id. at 101. Rawlings then claimed ownership of

the controlled substances. On review, the Supreme Court ruled that, even assuming the detention had violated Rawlings' constitutional rights, his "admissions were apparently spontaneous reactions to the discovery of his drugs in [the woman's] purse" and were unrelated to the terms of his arguably illegal detention while awaiting the search warrant. Id. at 108-09. Similarly, in this case, Hopewell spontaneously admitted to ownership of the cocaine and the type of weapon found in the house. Agent High never questioned Hopewell about who the cocaine belonged to. Instead, he merely informed Hopewell that drugs had been found in the house. Nor did Agent High question Hopewell about the weapon. Instead, he asked Sergeant Koo what type of weapon was recovered from the house and Hopewell, overhearing the question, responded that it was a Smith and Wesson .357 Magnum. The Court therefore finds that the statements Hopewell made in response to the discovery of narcotics and a weapon at 889 North Hill Lane were sufficiently attenuated from the taint of the illegal arrest and are admissible.[18]

## B.    Admissibility of the Evidence Seized During the Search

The Court turns now to the final question, whether the affidavit submitted in support of the search warrant for 889 North Hill Lane was so deficient as to render the evidence obtained from that search inadmissible. For the reasons stated below, the Court answers that question in the negative.

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation," U.S. CONST. amend. IV. However, a defendant seeking to

---

[18] The Court's holding turns on the finding of the Court below that the execution of the search warrant for 889 North Hill Lane was constitutional.

suppress evidence obtained pursuant to a search warrant faces a steep uphill battle.  Recognizing that "[r]easonable minds frequently may differ on the question whether a particular affidavit establishes probable cause," the Supreme Court has concluded that courts are to pay "great deference" to a warrant-issuing judge's determination of probable cause upon issuing a warrant.  United States v. Leon, 468 U.S. 897, 914 (1984).

Moreover, there is no per se rule that evidence obtained in violation of the Fourth Amendment must be excluded.  Indeed, the Supreme Court recognizes that "The Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands, and an examination of its origin and purposes makes clear that the use of fruits of a past unlawful search or seizure 'work[s] no new Fourth Amendment wrong.'" United States v. Leon, 468 U.S. 897, 906 (1984) (quoting United States v. Calandra, 414 U.S. 338, 354 (1974)).  "[T]he exclusionary rule is neither intended nor able to cure the invasion of the defendant's rights which he has already suffered."  Id. (internal quotation omitted).  Rather, the rule "operates as a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved."  Id. (internal quotation omitted).

With those principles in mind, the Supreme Court in Leon, 468 U.S. at 905, held that the exclusionary rule "should be modified so as not to bar the admission of evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective."  In other words, the fact that the warrant to search Hopewell's home may have been defective does not result in the automatic exclusion of evidence found during that search.  There are, however, four specific situations where the good faith reliance exception would not apply and evidence

may be excluded.  See Leon, 468 U.S. at 914-15, 922-23.  The Leon court identified these

situations as follows: (1) where the "the magistrate or judge in issuing a warrant was misled by

information in an affidavit that the affiant knew was false or would have known was false except

for his reckless disregard of the truth;" (2) where the "issuing magistrate wholly abandoned his

judicial role" and failed to act in a neutral and detached manor; (3) where the warrant is "based

on an affidavit so lacking in indicia of probable cause as to render official belief in its existence

entirely unreasonable;" and (4) where the warrant is "so facially deficient – i.e., in failing to

particularize the place to be searched or the things to be seized – that the executing officers

cannot reasonably presume it to be valid."  Id. at 923 (internal quotations omitted); see also

United States v. Van Shutters, 163 F.3d 331, 337 (6th Cir. 1998); United States v. Leake, 998

F.2d 1359, 1366 (6th Cir. 1993).

 In the instant case, Hopewell argues that the search warrant is defective because it is not

supported by probable cause.  Before analyzing the strength of the affidavit, the Court must

strike portions of the affidavit based on its finding that certain of Hopewell's statements are

inadmissible.  First, the Court strikes from the affidavit the statement that Hopewell had

$2,500.00 in United States currency on him, because none of the agents testified to finding this

money on Hopewell and the Court cannot determine from the affidavit whether it was found

prior to or after Hopewell's illegal arrest.  Next, the Court strikes Hopewell's statement that he

was coming from Lexington Avenue prior to the traffic stop and his explicit denial that he was

ever at 889 North Hill Lane because the Court has already ruled that those statements, which

Hopewell made when Agent High interviewed him at the Sheriff's Station, are inadmissible.

(Gov't Ex. 3A at 3.)  Finally, the Court strikes one statement that it finds to be inconsistent with

the testimony at the suppression hearing.[19]  Specifically, Agent Crock states on page two of the affidavit that "RENU surveillance agents observed 2 other vehicles arrive and the occupants enter 889 North Hill and stay for only a short time before leaving," (Gov't Ex. 3A at 2), whereas Agent Enderle testified the occupants stayed inside their cars and Hopewell came outside to speak to them.  Accordingly the Court strikes the words "and the occupants enter 889 North Hill" from the sentence describing the two cars.  The remainder of that sentence is consistent with Agent Enderle's testimony.

The Court doubts that the remaining evidence would support a finding of probable cause.  However, the affidavit was not so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.  Nor do any other exceptions to the <u>Leon</u> good faith rule apply.  Accordingly, even if the affidavit did not establish probable cause, the RENU agents' good faith reliance on the search warrant was reasonable and the evidence obtained during the search is admissible.  <u>See</u> <u>Leon</u>, 468 U.S. at 905, 923.

## III.    CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART** and **DENIES IN PART** Hopewell's Amended Motion to Suppress Evidence and Statements (doc. 28).  Hopewell's motion is granted as to the statements he made to Agent High between the time when he was transported to the Hamilton County Sheriff's Station and the search of 889 North Hill Lane, but

---

[19] At the time that Agent Crock was documenting information for the Affidavit, he was the only person in the RENU office.  As a result, he was responsible not only for monitoring the radio and phones for any new information related to the investigation, but also for running queries on the RENU database and additional computer-based research for the field agents.  At the suppression hearing, Agent Crock testified that "[i]t was probably pretty hectic in that office" and as a result he missed some information that the agents transmitted.

denied as to the remainder of Hopewell's statements and the evidence seized during the search of 889 North Hill Lane.

IT IS SO ORDERED.


_____s/Susan J. Dlott_____
Chief Judge Susan J. Dlott
United States District Court