# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| United States of America | : | Case No. 1:08-cr-065 |
| | : | |
| | : | Chief Judge Susan J. Dlott |
| v. | : | |
| | : | ORDER GRANTING |
| Joseph Hopewell, | : | DEFENDANT'S MOTION TO |
| | : | RECONSIDER AND |
| Defendant. | : | SUPPLEMENT THE RECORD |

This matter comes before the Court on Defendant Joseph Hopewell's Motion to Reconsider and Supplement the Record (doc. 105) and the Government's response (doc. 106). Upon review of Defendant's motion, the Court finds good reason to alter its original decision on Defendant's motion to suppress. Accordingly, for the reasons discussed below, the Court **GRANTS** Defendant's motion for reconsideration.

## I.    BACKGROUND

Hopewell's current motion is his third motion for reconsideration. Throughout the pendency of this case, Hopewell has persistently maintained that the evidence in this case should be suppressed because the Hamilton County Sheriff's Department Regional Narcotics Unit ("RENU") officers involved with his arrest and the search of the residence where he had been staying lacked probable cause to support their actions and did not act in good faith. The following passage, describing the events leading to the indictment of Hopewell, is taken from the Court's Order Granting in Part and Denying in Part Defendant's Motion to Suppress (doc. 60):

> The events [leading up to Hopewell's arrest] took place on March 24,
> 2008. On that day, Agent John Enderle was conducting surveillance in his

capacity as a RENU agent from an unmarked vehicle parked outside of a General Nutrition Center ("GNC") store in the Brentwood Plaza shopping center located on Winton Road in the Finneytown neighborhood of Cincinnati, Ohio. One of the methods RENU agents use to identify drug traffickers is to conduct surveillance outside of nutrition stores such as the GNC, looking specifically for individuals who purchase inositol, a B-12 vitamin supplement that is sold in the form of a white powder and that is commonly used as a cutting agent to increase the perceived volume of cocaine.[1] On those occasions, the agents inform the store that they are in the area and that the store should contact them if anyone purchases inositol.

On this particular day, Agent Enderle had been sitting in the Brentwood Plaza parking lot for one to two hours when, at approximately 4:02 p.m., he received a telephone call from an informant[2] who reported that a black male wearing a camouflage shirt, later identified as Algeria Fletcher, had come into the store and purchased a sixteen-ounce bottle of inositol. The informant also indicated that a black male wearing a grey shirt, later identified as Hopewell, was with Fletcher. Agent Enderle found the quantity of inositol purchased to be suspicious. He testified that if used as a vitamin supplement, a sixteen-ounce bottle of inositol would typically last over a year, and that it was uncommon for someone to purchase such a large quantity.[3]

After receiving the tip, Agent Enderle saw Hopewell and Fletcher, who was carrying a white GNC bag, exit the GNC store. Agent Enderle radioed other RENU agents about the inositol purchase as he observed Hopewell and Fletcher get into a sunburst-colored Cadillac and exit the shopping center. Having decided to investigate further, Agent Enderle followed the Cadillac as it turned onto Winton Road, then left on Galbraith Road, and proceeded to a subdivision that was located East of Winton Road and South of Galbraith Road. Hopewell, who was driving the Cadillac, entered his subdivision at Congresswood, turned onto Crowden, and then turned onto North Hill Lane. Agent Enderle initially stayed

---

[1] Inositol is a vitamin supplement that comes in the form of pills or a white powdery substance that may be mixed with food. When the powder form is used as recommended, an individual would only consume about one to two teaspoons per day. Agent Enderle testified that RENU had learned from Chicago DEA that roughly eighty percent of the cocaine that Chicago DEA recovered contained inositol.

[2] Agent Enderle testified that he had previously worked with this informant, who receives compensation from RENU for the information he provides, and that the informant's past tips had been reliable and had resulted in two arrests.

[3] GNC sells bottles of inositol powder ranging in size from two-ounce bottles to sixteen-ounce bottles.

2

behind on Crowden when he saw Hopewell park at 889 North Hill Lane. After observing Hopewell and Fletcher enter the house through a side door, Agent Enderle drove past the residence, crossed Winton Road, and positioned his car just west of Winton Road on North Hill Lane such that he could still see the residence.

In addition to Agent Enderle, who was the case agent on this particular investigation, several other agents responded to the area, including Lieutenant Winall, who supervised the investigation, Agent High, Sergeant Voelker, Agent Lee, Agent Lange, Agent Bennett, Agent Bernard Irwin, Agent Timothy Nash, Agent Stormes, and Sergeant Kevin Koo. Agent High, who was dressed in plain clothes and driving an unmarked vehicle, parked on Crowden to assist Agent Enderle with surveillance of the residence. Around the same time, Lieutenant Winall ordered Agent Crock to go to the RENU office to begin checking RENU's intelligence database for information relevant to the investigation and to start collecting information for a search warrant. Agent Crock remained at the office throughout the investigation and gathered information that the investigating officers relayed by phone or radio.

At approximately 4:18 p.m., the agents watching North Hill Lane observed a black male driving a gray Mercury Marquis with Virginia license plates pull up to the house and go inside. At 4:58 p.m., they observed another black male arrive on foot and enter the residence. The agents subsequently determined that the gray Mercury was a rental car and identified the man driving the Mercury as John McCoy and the man who arrived on foot as Bobby Pitts. Agent Enderle testified that he was not particularly concerned with the fact that the Mercury was a rental vehicle, though he noted that based on his experience, a lot of drug traffickers like to drive rental vehicles so that if an officer were to run the license of the vehicle, the query would not show the trafficker as the owner or driver.

Two additional vehicles, a maroon Nissan and a maroon Mercury Mountaineer pulled up to the 889 North Hill Lane residence at approximately 4:59 p.m. According to Agent Enderle and Agent High, Hopewell exited the house, spoke with a male who was driving the Mountaineer, and then went back inside. The vehicles then left. Queries of the vehicles' license plates revealed drug trafficking histories, meaning either the owners or previous drivers of the vehicles had histories of drug trafficking.

At approximately 5:43 p.m., McCoy, Pitts, Hopewell, and Fletcher left together in the Mercury rental vehicle. Sergeant Voelker,[4] who was in an unmarked vehicle,[5] followed the men after he spotted them on Crowden. He observed McCoy make a left turn onto Galbraith Road without signaling and radioed the other agents about the traffic violation. He then observed McCoy switch lanes without using a turn signal and radioed word of a second traffic violation.

At the direction of Lieutenant Winall, Agent Lange, a narcotics canine handler who was driving a marked Hamilton County Sheriff's cruiser and dressed in uniform, pulled McCoy over on Galbraith Road near a Walgreens drug store. Several agents assisted with the stop including Sergeant Voelker.[6] Agent Lange approached the driver's side of the Mercury, obtained McCoy's driver's license and proof of insurance, and went back to his car to run a query. The query showed no outstanding warrants for McCoy but revealed that he had a prior drug trafficking conviction. Agent Lange returned to the Mercury, obtained McCoy's consent to search the vehicle and asked the four men to step outside. Neither Agent Lange nor any of the other agents issued a traffic citation to McCoy. In fact, Agent Lange testified that RENU typically does not cite anyone for traffic violations. Rather, the intent of the agents was to speak to the occupants of the Mercury in furtherance of the narcotics investigation. After the men exited the vehicle,[7] the men were patted down for officer safety and moved to the side of the road near the sidewalk. Agent Lange obtained identification from Hopewell, Fletcher, and Pitts. In verifying their identities, Agent Lange discovered that Hopewell and Fletcher had past convictions for possession of drugs and that there was an open arrest warrant for Bobby Pitts related to a felony burglary charge.

_____

[4] Sergeant Voelker had been parked at the back entrance to a strip mall that connected to Hopewell's subdivision. From that entrance, Sergeant Voelker had a view of Crowden.

[5] Like Agent Enderle, Agent Voelker was wearing plainclothes. Agent Enderle testified that the general practice was that RENU agents driving unmarked cars also wore civilian clothing.

[6] Sergeant Voelker, Agent Lee, Agent Bennett, Agent Irwin, Agent Nash, Agent Stormes, Agent High, and Agent Enderle all responded to the traffic stop. Some of the agents assisted with the stop while others observed from a distance in order to protect their undercover identities. Agent Enderle, for example, parked in the Walgreens parking lot and observed the stop, but never got out of his car and left after a few minutes. When asked why so many officers participated in the stop, Sergeant Voelker testified that the officers were conducting a drug investigation and were concerned about safety and that there had to be enough officers to interview each of the four men in the car.

[7] According to Sergeant Voelker and Agent Enderle, the men appeared to exit the car voluntarly. None of the agents drew their weapons or forcibly removed the men from the car.

Due to the arrest warrant, Agent Lange and Sergeant Koo handcuffed Pitts, searched him, and placed him in Sergeant Koo's cruiser.

Meanwhile, Sergeant Voelker questioned Hopewell about where he had come from. Hopewell responded that he was coming from his home on Clark Street, which is in downtown Cincinnati. Sergeant Voelker did not clarify whether Hopewell meant he had just come from Clark Street or whether he had earlier that day come from Clark Street to Finneytown. Instead, Sergeant Voelker believed Hopewell was lying about having just come from 889 North Hill Lane and subsequently informed Agent Crock of Hopewell's statement.

Upon hearing that there was an open arrest warrant for Pitts and that Hopewell had stated he had come from Clark Street rather than North Hill Lane, Lieutenant Winall ordered the agents to transport all four of the men to the Sheriff's Station for further questioning. Agent Lange testified that due to safety concerns, Hopewell, McCoy, and Fletcher may have been handcuffed prior to being placed in separate police cars at the time of transport. Agent Lange, Agent Nash, and Agent Stormes subsequently searched the Mercury, but did not find any drugs. Nor did the agents find any drugs on Hopewell or any of the other men riding in the Mercury. At approximately 6:00 p.m., agents took Hopewell and the other men to the Sheriff's Station.

Some of the agents, including Agent Enderle and Sergeant Voelker, remained in Finneytown and resumed surveillance of the 889 North Hill residence. At approximately 6:00 p.m., Agent Enderle saw another vehicle, a gray Ford Explorer, pull up to 889 North Hill Lane. The driver of this vehicle parked and went inside the residence, where he stayed for over an hour. The man left the house at approximately 7:19 p.m. Sergeant Voelker followed the Explorer and observed the driver commit a traffic violation when exiting the subdivision. Shortly thereafter, Agent Nash pulled the Explorer over on Galbraith Road. At that time, Agent Nash identified the driver as Eric Brown, an individual with prior drug trafficking convictions.

Meanwhile, other agents responded to the Sheriff's Station to interview the suspects. Agent High interviewed Hopewell, who was already sitting in an interview room with Agent Nash when Agent High arrived at the station.[8] When Agent High entered the room, he identified himself to Hopewell and asked him if he could read and write. Hopewell responded that he had received a high school diploma from the correctional institution where he had been incarcerated, and that he can read and write. Hopewell asked what was going on, but Agent High put

---

[8] Agent Nash did not stay to witness the interview. Rather, he returned to the Finneytown area.

off explaining the situation, responding only that he would get to that later. Agent High then advised Hopewell of his *Miranda* rights. Hopewell indicated that he understood his rights, but would not sign the waiver of rights form.[9] (See Gov't Ex. 4A.) Prior to that time, none of the agents had Mirandized Hopewell.

Hopewell refused to sign the waiver of rights form, but proceeded to answer Agent High's questions. He stated that he lived with his sister at 733 Clark Street. When asked where he and the other men were coming from when stopped, Hopewell stated that he was coming from Lexington Avenue in Avondale. Agent High then asked Hopewell if he knew anyone at 889 North Hill Lane. When Hopewell responded that he did not know anyone on North Hill Lane, Agent High revealed that the agents had seen him at that residence. After a brief pause, Hopewell then indicated that he has a female friend who was staying there and that he also stays there periodically. Hopewell then stated that he and the other men were on their way to a hardware store when they were stopped. According to Hopewell, the men intended to purchase a chain so that they could hang a punching bag in the back yard. When asked about Pitts, Hopewell stated that he was a handyman and was doing some work for Hopewell – specifically, working on a fence in the back yard and building a kennel for Hopewell's dogs.

Agent High then turned to the purchase of inositol, asking Hopewell where he had been prior to arriving at 889 North Hill Lane. Hopewell stated that Fletcher had dropped him off at Petmart, which was in the same shopping center as GNC, to purchase dog food. After leaving Petmart, Hopewell stated, he walked down to the GNC to meet Fletcher. Hopewell confirmed that Fletcher had purchased inositol powder, and stated that he thought that the powder was used for weight loss.

At some point during the interview, Agent High asked Hopewell if there was anything illegal, such as drugs, inside the 889 North Hill Lane residence. Hopewell first responded that there was nothing in the house and that the agents could search it if they wanted. However, when Agent High asked Hopewell to sign a consent to search form, Hopewell refused and stated that if the agents wanted to search the residence, they would have to get a search warrant. Later in the interview, Agent High asked Hopewell again if there was anything illegal in the residence. That time, Hopewell responded that there may be a small amount of marijuana in the residence because he likes to smoke marijuana.

Throughout that evening, Agent Crock continued to document evidence as it was relayed to him by fellow RENU agents. The information he gathered included descriptions of the agents' observations, information from background

---

[9] The Advice of Rights form indicates that Agent High read Hopewell his rights at 6:19 p.m.

checks run on Hopewell and other individuals seen at 889 North Hill Lane, and statements from the suspects.  Based on this information, Agent Crock prepared an application for a warrant to search the residence at 889 North Hill Lane. (Gov't Ex. 3A.)  In the affidavit offered in support of the warrant application, Agent Crock describes the items expected to be found in the residence, including drugs and drug paraphernalia, and provides a detailed account of his prior training and experience.  The remainder of the facts included in the affidavit as a basis for establishing probable cause may be summarized as follows:

- At approximately 4:00 p.m., agents received a tip from a reliable informant, who had previously provided tips leading to arrests and convictions, that a black male had purchased a sixteen-ounce bottle of inositol from a GNC on Winton Road in Cincinnati, Ohio.
- Agent Crock and his fellow agents know that inositol is often used as an adulterant for cutting cocaine.
- Agent Enderle, who was present outside of the Winton Road GNC, observed a black male exit the store carrying a GNC bag and get into a car in which another black male was in the passenger seat.
- Agent Enderle followed the two men back to 889 North Hill Lane.
- After the vehicle returned to 889 North Hill Lane, agents conducting surveillance observed a black male driving a Mercury rental vehicle arrive and enter the house.
- The surveillance agents observed two other vehicles arrive and the occupants enter the house for a short time, and then leave.
- At approximately 5:45 p.m., surveillance agents then observed four males exit the house, get into the rental vehicle, and drive away.
- Sergeant Voelker observed traffic violations and the rental vehicle was stopped by marked RENU agents.
- After identifying the four men as Bobby Pitts, Joseph Hopewell, John McCoy, and Algeria Fletcher, the agents learned that Hopewell and Fletcher had previous convictions for possession of drugs, McCoy had a previous conviction for drug trafficking, and Pitts had an outstanding felony warrant for burglary.
- Hopewell provided misleading information to the agents when asked where he was coming from, stating at one point that he had come from Clark Street and at another point that he had come from Lexington Avenue.
- Hopewell had $2500 in U.S. currency on his person when he was stopped.
- Agents stationed near 889 North Hill Lane observed, after the four men had left, another vehicle arrive at the house.  The driver of the vehicle fit the description of Eric Brown, an individual tied to the license plate for that vehicle.  Brown has one prior conviction for possession of drugs and two prior convictions for drug trafficking.

- The RENU intelligence database shows that Hopewell and McCoy are known drug traffickers. A search of the RENU intelligence database revealed that on 8/18/05, RENU received a complaint that Joseph Hopewell was selling heroin, and that in 2003, Eric Brown was selling heroin.

Agent Crock concludes the affidavit by stating that service of the warrant during the night rather than the day is warranted to prevent further distribution of drugs into the community and to protect the safety of the agents executing the search warrant by allowing them to approach the residence undetected. (Gov't Ex. 3A at 3.)

Based upon this affidavit, a Hamilton County Municipal Court Judge issued a warrant authorizing a search of the residence. (Gov't Ex. 3B.) The judge signed the warrant at 7:59 p.m. After obtaining the warrant, Agent Crock called Lieutenant Winall to inform him that the warrant was signed. After learning of the warrant, agents proceeded with the search. Therefore, the search was already in progress by the time Agent Crock responded to 889 North Hill Lane to serve the warrant and assist in the search. Agent Crock later went to the Sheriff's Station to serve Hopewell with a copy of the warrant.

In addition to Agent Crock, Sergeant Voelker, Lieutenant Winall, Detective Roa, Agent Nash, Agent Lee, and Officer Lange, and Agent Heidemann all participated in the search. (*See* Def. Ex. F1.) Sergeant Voelker was one of the first officers to enter the house when executing the warrant. At approximately 8:00 p.m., he knocked on the front door because the agents had seen people inside. Through the window, Sergeant Voelker could see a woman inside the house walking from the living room to the kitchen. He showed the woman his badge and asked her to come to the door. Rather than answering the door, the woman went back into the living room and then returned to the kitchen, grabbed a plastic Kroger bag, and took it into another room. Finally at that point someone opened the door and the agents identified themselves and informed the occupants of the house that they had a search warrant. Sergeant Voelker did not actually have possession of the search warrant at that time. Rather, he had learned either by radio or by phone that the warrant had been signed. During the search, Sergeant Voelker located the Kroger bag in a closet next to the living room. The bag contained approximately 800 grams of powder cocaine. In addition to that cocaine, the agents found a small bag of marijuana, $26,683 in cash, a cocaine press, digital scales, a loaded Smith and Wesson .357 Magnum revolver, a sixteen-ounce bottle of inositol, and twenty-three grams of crack-cocaine.

The agents who executed the search informed the agents at the Sheriff's Station of the evidence that they found. Sergeant Koo then relayed this information to Agent High while Agent High was still in the interview room with

Hopewell. Specifically, Sergeant Koo stated that the agents had recovered a large amount of powder cocaine, a smaller amount of crack-cocaine, and a gun. He then stated that upon entering the residence, the agents saw a female grab a bag that was later found to contain cocaine and attempt to hide it in a closet. When Agent High told Hopewell about the drugs and gun recovered from the house and explained that the agents had seen the female attempt to hide the drugs, Hopewell stated, "The cocaine is mine." (Tr. 222:14.) Agent High then asked Hopewell, "Where did you get the cocaine from if it's yours?" At that point, Hopewell stated that he did not want to answer that question. Agent High stopped questioning Hopewell at that point. However, Hopewell subsequently made an additional statement regarding the gun found in the house. Hopewell was not asked about the gun. Rather, while doing arrest paperwork for Hopewell, Agent High asked Sergeant Koo what type of gun was recovered from the house. Before Sergeant Koo could answer, Hopewell responded that it was a Smith and Wesson .357 Magnum. Sergeant Koo then confirmed that the weapon Hopewell described was the weapon recovered during the search. Agent High testified that Hopewell never asked for an attorney during the interview and claimed that all questioning would have ceased had Hopewell asked for an attorney.

(Doc. 60 at 2-13.)

On June 18, 2008, Hopewell was indicted with two counts of illegal possession of a firearm and two counts of unlawful possession with intent to distribute narcotics. Hopewell filed his original Motion to Suppress Evidence and Statements (doc. 15) on July 11, 2008 and an Amended Motion to Suppress Evidence and Statements (doc. 28) on August 20, 2008. The Court held a suppression hearing on October 29, 2008. Both the Defendant and the Government then filed post-hearing briefs (docs. 51, 52). After having considered the evidence presented at the hearing, the Court granted in part and denied in part Hopewell's motion. (Doc. 60.) Specifically, the Court found that the officers exceeded the scope of the their initial Terry Stop at the point when they handcuffed Hopewell, placed him in a police cruiser, and transported him from the scene of the traffic stop to the Sheriff's Station for further questioning. Accordingly, the Court suppressed the statements that Hopewell made at the Sheriff's station between the time of his arrest and the search of 889 North Hill Lane because though statements were obtained

through the exploitation of an illegal arrest. In contrast, the Court found that the statements Hopewell made after the search of 889 North Hill Lane were admissible because those statements were sufficiently attenuated from the taint of the illegal arrest.

With regard to the search of the house, the Court found that the warrant likely was not supported by probable cause, but that the *Leon* good-faith exception applied, meaning that the evidence seized during the search of the house would be admissible even in the absence of probable cause. *See United States v. Leon*, 468 U.S. 897, 905, 922-23 (1984). It is that ruling – the application of the *Leon* good-faith exception – that Hopewell now asked this Court to reconsider.

As stated above, Hopewell twice previously has asked this Court to reconsider its ruling. (*See* docs. 68, 84.) He also moved for a *Franks* hearing, and when this Court denied that motion, he filed a pro se motion for reconsideration of that decision. (*See* docs. 77, 79, 82.) On July 30, 2009, the Court held a hearing on Defendant's Motion for Reconsideration of the Court's Order on Motion for a Franks Hearing and Defendant's second motion for reconsideration as to the suppression order. At that hearing, Hopewell relied on a case from the First District Court of Appeals, Hamilton County, Ohio. Like this case, the state case also involved an investigation into an individual who had purchased inositol from a GNC. At least two of the same officers were involved in that case and Agent Crock was the affiant on the warrant affidavit. *See Ohio v. Hampton*, C-080187, 2008 WL 5046808 (Ohio Ct. App. Nov. 26, 2008). Hopewell relied on *Hampton* for the premise that the good-faith exception to the warrant requirement should not apply where officers base probable cause on the purchase of inositol. *See id.* at *4.

In an Order dated July 31, 2009, this Court denied Hopewell's motion for reconsideration as to the Franks hearing request and his second motion for reconsideration as to the suppression of evidence and statements. At the time the Court issued that Order, the only document from the *Hampton* case that had been submitted to the Court was the November 26, 2008 First District Court of Appeals decision. The Court was able to glean the following facts from the *Hampton* Court of Appeals decision:

> In *Hampton*, Agent Crock submitted an affidavit in support of a warrant to search Hampton's residence. The affidavit, in addition to describing Agent Crock's background, stated that a reliable confidential informant informed law enforcement that Hampton had purchased sixteen ounces of inositol at a particular store, and that police officers had seen Hampton and a female companion enter the same store and leave carrying a white bag, which Hampton placed in the trunk of his car. *Id.* at *1. The affidavit then described Agent Crock's knowledge of and past experience with the use of inositol as a cutting agent for cocaine. *Id.* A judge issued a warrant based on that affidavit and a search of Hampton's residence produced 597 grams of cocaine, a gun, and a scale. *Id.* Hampton subsequently moved to suppress the evidence seized during the search and introduced evidence of a number of legal uses of inositol and of the variation in dosages required for those legal uses. *Id.* at *1-2. The trial court denied Hampton's motion, holding that the warrant was not supported by probable cause, but that the police officers' reliance on the warrant was reasonable and the *United States v. Leon* good-faith exception to the exclusionary rule applied. *Id.* at *2.

(Doc. 92 at 3-4.) The Ohio First District Court of Appeals affirmed the trial court's decision as to the search warrant. However, the court noted that although the good-faith exception applied in *Hampton*, "now that the police are on notice of the number of legal uses of inositol and variations in dosages, the good faith exception will not apply in the future." *Id.* at *4.

In denying Hopewell's second motion for reconsideration, this Court ultimately determined that the *Hampton* appellate court decision did not alter the Court's ruling as to Hopewell's motion to suppress the evidence in this case. The Court noted that "the *Hampton* opinion was issued approximately seven months after Hopewell's residence was searched.

11

Therefore, at the time of the search, the officers were not on notice that they could not reasonably rely on the search warrant." (Doc. 92 at 4-5.) The Court also distinguished *Hampton* on the basis that the affidavit in this case contained a number of facts in addition to the purchase of inositol that were pertinent to the probable cause determination. Finally, the Court reiterated its doubt as to whether those facts ultimately were sufficient to establish probable cause, but found that the *Hampton* decision did not change this Court's previous finding that the good-faith exception to the exclusionary rule is applicable in the instant case. Again, the Court's consideration of the *Hampton* case was based solely on the information included in the Ohio First District Court of Appeals decision.

On August 28, 2009, Hopewell's attorney filed a motion requesting that the Court allow him to withdraw, claiming that his relationship with Hopewell had become strained and that Hopewell stated that he wanted new representation. The Court granted defense counsel's motion to withdraw and appointed new counsel. On December 2, 2009, Hopewell's current counsel filed a third motion for reconsideration. (Doc. 105.) With this most recent motion, Defendant once again asks the Court to reconsider the application of the *Leon* good-faith exception in this case based on the fact that the officer who sought the warrant in the *Hampton* case is the same officer who applied for the warrant in the instant case and therefore should have known that it was unreasonable to place so much emphasis on the purchase of inositol. With his third motion for reconsideration, defense counsel relies not only on the *Hampton* appellate court decision, but also supplied (a) the actual warrant affidavit at issue in *Hampton*, and (b) a transcript of the January 15, 2008 hearing on Hampton's motion to suppress before Judge Ruehlman in the Hamilton County, Ohio Court of Common Pleas. (*See* doc. 105 Exs. A, B.)

## II.    ANALYSIS

### A.    New Documents from *Ohio v. Hampton*

The *Hampton* warrant affidavit and January 15, 2008 suppression hearing transcript submitted by Defendant shed more light on the circumstances surrounding the *Hampton* case and the information available to Agent Crock on March 24, 2008, the date that he sought the search warrant for Hopewell's residence.  The investigation in *Hampton* appears to have begun just as the investigation in the instant case did, with a tip from a confidential informant that a black male, later identified as Hampton, purchased a sixteen ounce bottle of inositol from a GNC store in Cincinnati, Ohio.  After receiving the tip, RENU initiated an investigation and Agent Crock applied for a warrant to search Hampton's residence based on the following information, as described in the warrant affidavit:

> Affiant, Agent William Crock Jr. is employed by the Hamilton County Sheriff's Office and has been so employed for approximately 15 years.  In the last 6 1/2 years, your Affiant has been assigned as a narcotics investigator assigned to the Regional Narcotics Unit.  Your Affiant has received numerous hours of on the job training from the Regional Narcotics Unit and the Ohio State Highway Patrol Interdiction Unit.  The Affiant is familiar with the methods utilized by narcotics traffickers to prepare, transport, ship and distribute illegal narcotics into the community, as well as methods used to avoid both detection by law enforcement and the loss of assets obtained from trafficking narcotics.  Your Affiant has been involved with several hundred investigations resulting in the recovery of significant quantities of narcotics and the arrest and successful prosecution of persons involved with its distribution.
>
> Affiant states on May 30, 2007, at approximately 2:15 p.m., a confidential reliable informant, who wishes to remain anonymous, and has given information to law enforcement in the past that has lead to the seizure of narcotics and arrests and convictions of subjects for Drug Trafficking and Drug Possession and has also provided other information leading to past arrests has been independently verified and corroborated by law enforcement, stated a male black, later identified as Jamal Hampton, purchased 16 ounces of Inositol from the GNC located in the Rookwood Plaza in Norwood, Ohio.  Inositol is a substance known by your affiant and brother RENU Agents, commonly used as an adulterant for "cutting"

13

cocaine. Your Affiant was provided information from brother officers that the DEA lab located in Chicago reports that a very large amount of cocaine submissions analyzed contain adulterants such as Inositol.  This is an inexpensive method for large drug traffickers to increase the size of cocaine with little to no physical alteration. According to the manufacture of Inositol, a single serving consists of a quarter teaspoon a day.  The 16 ounces of Inositol purchased on today's date of May 30, 2007, would last approximately 760 days.  The distributors of Inositol advised that other supplements are available that perform the same as Inositol and cost much less and in some cases produce additional supplements to the body. Your Affiant has, in the past three years, investigated numerous individuals purchasing large amounts of Inositol.  It has been your Affiant's experience that in 100% of the time, these individuals have been involved in using the Inositol as a cutting agent for cocaine, or buying the Inositol for other individuals who in turn were using it to "cut" cocaine.

Your Affiant says brother officer Sergeant Scott Fritz observed a male black and female black exit the GNC store located in the Rookwood Plaza and enter a white colored 1995 Chevrolet Monte Carlo (Ohio-CKH3155).  Sergeant Scott Fritz observed Hampton carrying a white bag.  The Ohio Registration returns to Jamal Hampton RCIC#1851071.  A criminal inquiry on Jamal Hampton revealed he was convicted of no criminal record in 2005, Attempted CCW in 2005, and no criminal record in 2002.

Sergeant Scott Fritz and Agent Aaron Jones observed the vehicle on Larkspur Avenue.  Your Affiant further says that a short time later, Agent Aaron Jones observed a male black and a female black get into the 1995 Chevrolet.  Lieutenant Brad Winall observed the male black open the trunk of the vehicle and a short time later close the trunk.  Your Affiant also says brother officer then observed the vehicle travel to Commodore Lane in Colerain Township.  The Ohio registration (CKH3155) returns to Jamal Hampton at 2963 Commodore Ln Apartment 1 Cincinnati Ohio 45251.

Your Affiant further says, Agent Joe Lee observed a male black and female black exit the 1995 Chevrolet, and enter 2963 Commodore.  Agent Joe Lee observed the male black carrying a white bag and a female black carrying a white bag and enter 2963 Commodore. Your Affiant states Agent Joe Lee positively identified Jamal Hampton, by a RCIC photo, as the driver of the vehicle.

Affiant also states that it has been his experience that individuals who abuse controlled substances often will conceal contraband in their vehicles and keep weapons in the residence to protect the contraband.  Your Affiant further states that individuals who abuse narcotics will often times accept bartered items for the contraband instead of US currency.

> Your Affiant believes there is a substantial amount of narcotics at 2963
> Commodore Apartment 1 for the following reasons:
> 1.  Jamal Hampton purchased 16 ounces of Inositol.  Brother officers
>     observed Jamal Hampton enter 2963 Commodore. A license check reveals
>     Hampton lives in apartment 1 at 2963 Commodore.
> 2.   Inositol is a known by your affiant and brother officers as a cutting agent
>     for cutting cocaine.
> 3.  Your Affiant knows that through years of investigating individuals
>     purchasing large amounts of Inositol, none were for legitimate purposes.

(Doc. 105 Ex. A at 1-2.)

At the January 15, 2008 suppression hearing in *Hampton*, during which Agent Crock was present, Hampton's attorney argued that the affidavit did not establish probable cause to support a search warrant and that Agent Crock knowingly or recklessly included false information in the affidavit regarding that nature of inositol.  (*See* doc. 105 Ex. B.)  During the hearing, Hampton's attorney called a doctor to testify as an expert witness about the various uses of inositol.  That witness testified that inositol is a legal substance and that depending on how often a person uses the supplement, a sixteen ounce bottle could last a year or two.  The expert also submitted an affidavit indicating that some people may use inositol in higher dosages to treat certain medical conditions, and in those cases, sixteen ounces of inositol may only be enough for about one month.

Following the hearing, Judge Ruehlman found that while some of the information in the affidavit regarding the nature of inositol and the amount of time that a sixteen ounce bottle would last may have been incorrect, Agent Crock did not intentionally or recklessly include false information.  Judge Ruehlman then denied the motion to suppress, finding that although the warrant affidavit was insufficient to establish probable cause, the officers were entitled to rely on the affidavit in good faith.  As stated above, Judge Ruehlman's decision was subsequently

affirmed by the Ohio First District Court of Appeals in *Ohio v. Hampton*, C-080187, 2008 WL

5046808 (Ohio Ct. App. Nov. 26, 2008).

### B.     Application of the *Leon* Good-Faith Exception

In his motion for reconsideration, Defendant requests that this Court reconsider the

application of the *Leon* good-faith exception in this case.  As stated above, this Court found that

the warrant in this case likely was not supported by probable cause, but that the *Leon* good-faith

exception applied, meaning that the evidence seized during the search of the house would be

admissible even in the absence of probable cause.  *See Leon*, 468 U.S. at 905, 922-23.  In *Leon*,

the Supreme Court held that the exclusionary rule "should be modified so as not to bar the

admission of evidence seized in reasonable, good-faith reliance on a search warrant that is

subsequently held to be defective."  468 U.S. at 905.  In other words, the fact that the warrant

may not be supported by probable cause does not result in the automatic exclusion of evidence

found during that search.  There are, however, four specific situations where the good-faith

exception would not apply and evidence may be excluded.  *See id.* at 914-15, 922-23.  Those

situations are: (1) where the "the magistrate or judge in issuing a warrant was misled by

information in an affidavit that the affiant knew was false or would have known was false except

for his reckless disregard of the truth;" (2) where the "issuing magistrate wholly abandoned his

judicial role" and failed to act in a neutral and detached manner; (3) where the warrant is "based

on an affidavit so lacking in indicia of probable cause as to render official belief in its existence

entirely unreasonable;" and (4) where the warrant is "so facially deficient – i.e., in failing to

particularize the place to be searched or the things to be seized – that the executing officers

cannot reasonably presume it to be valid."  *Id.* at 923 (internal quotations omitted); *see also*

*United States v. Van Shutters*, 163 F.3d 331, 337 (6th Cir. 1998); *United States v. Leake*, 998

F.2d 1359, 1366 (6th Cir. 1993).  Hopewell argues that the first and third situations are present in

the instant case.

### 1.  Knowing or Reckless Inclusion of False Information

The newly submitted evidence related to the *Hampton* case establishes that Agent Crock

had notice of the numerous legal uses of inositol and variations in dosage at the time he drafted

the affidavit and applied for the warrant in the instant case.  Hopewell argues that Agent Crock

mislead the judge who issued the warrant in this case by failing to include that information in the

affidavit he submitted in support of his application warrant to search 889 North Hill Lane.

The first limitation to the *Leon* good-faith exception stems from *Franks v. Delaware*, 438

U.S. 154 (1978).  Under *Franks*, a party may challenge the veracity of a search warrant affidavit

only upon a substantial preliminary showing that a false statement was included knowingly and

intentionally or with reckless disregard for its truth and that the allegedly false statement was

necessary for a finding of probable cause.  *See also United States v. Stuart*, 507 F.3d 391, 396

(6th Cir.2007) (construing *Franks*).

Agent Crock made the following statements about inositol in the search warrant affidavit

that he submitted in this case:

> Affiant states on March 24, 2008 at approximately 4:00 p.m., a confidential
> informant . . . stated a black male purchased 16 ounces of Inositol from the GNC
> located on Winton Road in Finneytown in Cincinnati, Ohio, Hamilton County.
> Inositol is a substance known by your affiant and brother RENU Agents,
> commonly used as an adulterant for "cutting" cocaine.  Your Affiant was
> provided information from brother officers that the DEA lab located in Chicago
> reports that a very large amount of cocaine submissions analyzed contain
> adulterants such as Inositol.  This is an inexpensive method for large drug
> traffickers to increase the size of cocaine with little to no physical alteration.
> Your Affiant has, in the past four years, investigated numerous individuals

purchasing Inositol. It has been your Affiant's experience that these individuals have been involved in using the Inositol as a cutting agent for cocaine, or buying the Inositol for other individuals who in turn were using it to "cut" cocaine.

(Doc. 34-1 at 1-2.) There is no evidence that those statements are actually false. This is not the same description of inositol that Agent Crock included in the *Hampton* affidavit. Indeed, the description of inositol that was in the *Hampton* affidavit makes it sound as though there is no legitimate reason for someone to purchase a sixteen ounce bottle. In contrast, in this case, Agent Crock stated only that inositol is commonly used as a cutting agent and that he has previously investigated numerous individuals who purchased inositol to use as a cutting agent. He did not state that all individuals who purchase inositol use it to cut cocaine. Nor did he make any statement about how long a sixteen ounce bottle would last if used as directed or suggest that there are less expensive supplements. While many people may use inositol as a legal dietary supplement, there in no evidence that it is not also commonly used as a cutting agent or that the specific individuals whom Agent Crock investigated in the past did not, in fact, use inositol as a cutting agent. Accordingly, the Court cannot find that the statements Agent Crock made were false.

On the other hand, Hopewell is correct that Agent Crock did not include all of the information he had about inositol. The question is whether that omission was sufficiently serious as to result in a *Franks* violation. While the *Franks* doctrine typically applies to false *statements*, it can also apply to omissions under certain circumstances. *United States v. Bonds*, 12 F.3d 540, 568-69 (6th Cir. 1993). However, omissions are "less likely to present a question of impermissible conduct." *United States v. Atkins*, 107 F.3d 1213, 1217 (6th Cir. 1997). "[B]ecause an allegation of omission potentially opens officers to endless conjecture about

18

investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit," it is much rarer for omissions to warrant a *Franks* hearing. *See id.* Indeed, the Sixth Circuit has held that "except in the very rare case where the defendant makes a strong preliminary showing that the affiant with an intention to mislead excluded critical information from the affidavit, and the omission is critical to the finding of probable cause, Franks is inapplicable to the omission of disputed facts." *Mays v. City of Dayton*, 134 F.3d 809, 816 (6th Cir. 1998). Hopewell fails to make such a showing in this case. There simply is little if any evidence that Agent Crock excluded information about the various dietary and medical uses of inositol with an intention to mislead the warrant-issuing judge. To fault Agent Crock for not explicitly pointing out other possible uses of inositol may result in a situation where officers would feel compelled to list possible alternative legitimate uses of items such as baking soda or plastic bags, items which are legal but are often used in the trafficking of drugs, when discussing those items in a warrant affidavit.

As there is no evidence that Agent Crock knowingly or recklessly made a false statement or omitted information with the intention of misleading the warrant-issuing judge, the first limitation to the *Leon* good-faith exception is not present in this case.

### 2. Affidavit so Lacking in Probable Cause as to Render Belief in its Existence Unreasonable

Hopewell makes a more persuasive argument with regard to the third *Leon* limitation – that the affidavit in this case was so lacking in probable cause as to render belief in its existence unreasonable. Hopewell argues that:

> In light of the numerous legitimate uses and variations in dosages of inositol, even acknowledging the illicit use, combined with the Court's redactions, there is now significantly less evidence to support a finding of probable cause. Eliminating or

giving scant weight to the inositol, the affidavit is now so lacking in probable cause to render official belief in its existence unreasonable.

(Doc. 105 at 8.)

This Court already determined, in the Order Granting in Part and Denying in Part Defendant's Motion to Suppress that certain portions of the warrant affidavit should be stricken. Specifically, the Court struck: (1) the statement that Hopewell had $2,500.00 in United States currency on him;[10] (2) Hopewell's statement that he was coming from Lexington Avenue prior to the traffic stop and his explicit denial that he was ever at 889 North Hill Lane;[11] and (3) the phrase "and the occupants enter 889 North Hill" from the statement, "RENU surveillance agents observed 2 other vehicles arrive and the occupants enter 889 North Hill and stay for only a short time before leaving."[12] (Doc. 34-1 at 2.) Hopewell now asks the Court also to strike the portions of the affidavit that pertain to inositol. The Court finds no basis to strike those statements. As discussed above, there is little to no evidence that those statements are false or that Agent Crock included them with the intention of misleading anyone. Nonetheless, the new information regarding the legal uses of inositol sheds greater light on the amount of weight that should be afforded the purchase of inositol as described in the affidavit.

---

[10] The Court struck this statement because none of the agents testified to finding this money on Hopewell and the Court could not determine from the affidavit whether it was found prior to or after Hopewell's illegal arrest.

[11] The Court ruled that those statements, which Hopewell made when Agent High interviewed him at the Sheriff's Station, are inadmissible.

[12] The Court struck that phrase because it was inconsistent with the testimony elicited at the suppression hearing. Agent Enderle testified the occupants stayed inside their cars and Hopewell came outside to speak to them.

After excising the facts described above, the affidavit contains the following factual information relevant to the determination of probable cause:

At approximately 4:00 p.m., agents received a tip from a reliable informant, who had previously provided tips leading to arrests and convictions, that a black male had purchased a sixteen-ounce bottle of inositol from a GNC on Winton Road in Cincinnati, Ohio.

- Agent Crock and his fellow agents know that inositol is often used as an adulterant for cutting cocaine.
- Agent Enderle, who was present outside of the Winton Road GNC, observed a black male exit the store carrying a GNC bag and get into a car in which another black male was in the passenger seat.
- Agent Enderle followed the two men back to 889 North Hill Lane.
- After the vehicle returned to 889 North Hill Lane, agents conducting surveillance observed a black male driving a Mercury rental vehicle arrive and enter the house.
- The surveillance agents observed two other vehicles arrive, stay for a short period of time, and then leave.
- At approximately 5:45 p.m., surveillance agents then observed four males exit the house, get into the rental vehicle, and drive away.
- Sergeant Voelker observed traffic violations and the rental vehicle was stopped by marked RENU agents.
- After identifying the four men as Bobby Pitts, Joseph Hopewell, John McCoy, and Algeria Fletcher, the agents learned that Hopewell and Fletcher had previous convictions for possession of drugs, McCoy had a previous conviction for drug trafficking, and Pitts had an outstanding felony warrant for burglary.
- When asked where he was coming from, Hopewell stated he had come from Clark Street.
- Agents stationed near 889 North Hill Lane observed, after the four men had left, another vehicle arrive at the house. The driver of the vehicle fit the description of Eric Brown, an individual tied to the license plate for that vehicle. Brown has one prior conviction for possession of drugs and two prior convictions for drug trafficking.
- The RENU intelligence database shows that Hopewell and McCoy are known drug traffickers. A search of the RENU intelligence database revealed that on 8/18/05, RENU received a complaint that Joseph Hopewell was selling heroin, and that in 2003, Eric Brown was selling heroin.

(*See* doc. 34-1.)

"Determining whether the affidavit is so bare bones as to preclude application of the good-faith exception is a less demanding inquiry than the one involved in determining whether the affidavit provided a substantial basis for the magistrate's conclusion of probable cause." *United States v. McPhearson*, 469 F.3d 518, 526 (6th Cir. 2006). In conducting the good-faith inquiry, the Court must examine "the affidavit for particularized facts that indicate veracity, reliability, and basis of knowledge and go beyond bare conclusions and suppositions." *Id.* Ordinarily, when considering whether an officer could rely on the affidavit in good faith, the Court is bound by the four corners of the affidavit and cannot consider the officer's state of mind. *United States v. Laughton*, 409 F.3d 744, 748-49 (6th Cir. 2005). The Sixth Circuit reiterated that standard in *Laughton,* holding that "a determination of good-faith reliance, like a determination of probable cause, must be bound by the four corners of the affidavit." *Id.*

There are exceptions to that rule, however. The *Leon* court itself recognized that there may be circumstances in which a court should look beyond the affidavit: "our good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization. In making this determination, *all* of the circumstances – including whether the warrant application had previously been rejected by a different magistrate – may be considered." *Leon*, 468 U.S. at 923 n. 23 (emphasis added). Seizing on that portion of the *Leon* decision, the Sixth Circuit has "interpret[ed] *Laughton's* holding as limited to answering the question . . . whether the search could have been saved under the good faith exception on the basis that the officers had other information that was not presented to the issuing magistrate, but that would have established probable cause." *United States v. Frazier*, 423 F.3d 526, 534-35 (6th Cir. 2005) (emphasis

added). The Frazier court went on to carve out an exception to *Laughton*, holding that "a court reviewing an officer's good faith under *Leon* may look beyond the four corners of the warrant affidavit to information that was known to the officer and revealed to the issuing magistrate." *Id.* at 536.

Applying the same reasoning that the Sixth Circuit applied in *Frazier*, this Court finds that this is one of the rare cases wherein it is appropriate to consider information that was known to the officer at the time of seeking the warrant but that was not included in the warrant affidavit. Although this is not a situation in which a different magistrate had previously rejected the affidavit, the *Hampton* suppression hearing transcript demonstrates that just two months prior to seeking the warrant in this case, Agent Crock sat through a hearing in which a judge ruled that a similar affidavit was not supported by probable cause. Additionally, during that hearing, Agent Crock was put on notice of a variety of legitimate reasons why an individual might purchase a sixteen ounce or similar size bottle of inositol. Therefore, it was not reasonable for Agent Crock to place as much emphasis as he did on the purchase of inositol in the instant case. Following the *Hampton* hearing, Agent Crock and the other RENU agents should have reevaluated their practice of investigating and subsequently arresting people on the basis of the purchase of inositol. At the very least, they should have modified that practice so that they gathered more evidence of actual *illegal* activity prior to seeking a search warrant. The Court cannot, under these circumstances, conclude that the officers were acting in good faith. Indeed, this is precisely the type of situation to which the exclusionary rule should apply – a situation in which the exclusion of evidence will deter future violations of the Fourth Amendment. *See Leon*, 468 U.S. at 897.

This Court has previously noted that this is a close case. The events described in the affidavit, even when considered in totality, barely rise to the level of reasonable suspicion. The connection of those activities to the alleged criminal drug activity depends heavily on the assumption that it is abnormal for an individual to purchase a sixteen ounce bottle of inositol and that it is likely that the inositol would be used to cut cocaine. Other than that, the facts are merely that a number of individuals, some of whom had past convictions for drug trafficking and/or possession went to and left from 889 North Hill Lane at various times during a several-hours-long period. The fact that, as it turns out, people also use inositol for dietary or medical reasons makes the already tenuous connection between the inositol purchase and the suspected drug trafficking even more tenuous. Accordingly, the Court finds that the affidavit in this case was so lacking in indicia of probable cause as to render belief in its existence unreasonable.

Finally, the Court finds that the fact that Agent Crock was not directly involved in the execution of the warrant does not alter the Court's conclusion. As noted by the Supreme Court in *Leon*:

> It is necessary to consider the objective reasonableness, not only of the officers who eventually executed a warrant, but also of the officers who originally obtained it or who provided information material to the probable-cause determination. Nothing in our opinion suggests, for example, that an officer could obtain a warrant on the basis of a "bare bones" affidavit and then rely on colleagues who are ignorant of the circumstances under which the warrant was obtained to conduct the search.

*Leon*, 468 U.S. at 923.

### C.     Suppression of Evidence

Having found that the *Leon* good-faith standard should not apply to save the warrant to search 889 North Hill Lane, the Court suppresses all evidence seized during the search of the

residence.  The Court also suppresses the statements that Hopewell made at the Sheriff's station following the search – specifically, his statement that the cocaine was his and his identification of the type of weapon retrieved from the house.  Hopewell would not have made those statements had the illegal search of his residence not occurred.  Accordingly, they constitute fruit of the poisonous tree and are inadmissible.

## III.    CONCLUSION

For the reasons stated above, Defendant Joseph Hopewell's Motion to Reconsider and Supplement the Record (doc. 105) is **GRANTED**.  The Court hereby suppresses all evidence seized during the search of 889 North Hill Lane.  The Court also suppresses the statements Hopewell made immediately after the search relating to the seized evidence on the basis that those statements constitute fruit of the poisonous tree.

IT IS SO ORDERED.


S/Susan J. Dlott
Chief Judge Susan J. Dlott
United States District Court